UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KERRIE MILLIGAN-GRIMSTAD, | |
| Plaintiff, | No. 13 C 8913 |
| v. | Judge Thomas M. Durkin |
| MORGAN STANLEY; MORGAN STANLEY SMITH BARNEY LLC, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Kerrie Milligan-Grimstad alleges that her former employer Morgan Stanley Smith Barney LLC ("MSSB") fired her on account of her gender and subjected her to unlawful harassment in violation of Title VII of the Civil Rights Act of 1964. Plaintiff has also sued MSSB's parent company Morgan Stanley. Defendants have moved for summary judgment. R. 47. For the following reasons, that motion is granted.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013).

To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Background**

Plaintiff worked at the Chicago branch of MSSB for 11 years.[1] During that entire time, the office was predominantly staffed and managed by men.

Plaintiff began as a sales assistant in 2001. She completed financial advisor training, and became a financial advisor in 2003. Beginning in 2005, she began working in partnership with a more senior financial advisor, John Mitchell, on a number of accounts. The partnership agreement between Mitchell and Plaintiff was renewed annually and subject to termination at any time by either.

From 2003 to 2009, Plaintiff was subjected to a number of discriminatory and harassing comments, undue criticism of her job performance, and unwanted sexual advances by a number of male employees, including a financial advisor named

---

[1] There is some dispute as to which of the Defendant Morgan Stanley entities was Plaintiff's employer at the time of her termination. Defendants assert, and the record strongly supports, if not proves, that MSSB was Plaintiff's employer. Plaintiff asserts in a footnote on the cover of her response brief that Morgan Stanley has not appeared in this case and is thus is not entitled to summary judgment. This is incorrect. Greenberg Traurig represents both Defendants and moves for summary judgment for both. Moreover, Title VII claims can only be asserted against an employer. Morgan Stanley was not Plaintiff's employer and thus Plaintiff's claims against Morgan Stanley fail as a matter of law.

2

David Brendza. She never reported any of these incidents to Human Resources as MSSB's harassment policy required because she felt that reporting in a male-dominated culture would cause her career to suffer. She does not claim, and the record does not reflect, that Mitchell engaged in any inappropriate conduct toward or around her during this time period.

However, in 2011, Mitchell "talk[ed] regularly in the office about the revealing outfits worn by a CNBC news anchor" and occasionally commented to male co-workers "about women they saw coming up the escalator in their short skirts." Plaintiff also testified that around the time she got married in April 2012, Mitchell, who at that time spent two-thirds of the year in Arizona and one-third in Chicago, repeatedly asked her to plan her pregnancies around his snowbird schedule.

As Mitchell approached retirement, a topic he frequently raised, Plaintiff testified that management encouraged her and Mitchell to consider partnering with Brendza and his brother Richard to manage Mitchell and Plaintiff's book of business. Mitchell remembers it differently, and testified at his deposition that the idea of bringing the Brendzas into the partnership was his and Plaintiff's jointly, and that they'd all but agreed, together, that they would recruit the Brendzas to facilitate Mitchell's retirement. David Brendza's recollection is similar. He testified that he and his brother were approached by Mitchell and Plaintiff, who asked if they would be interested in working on some of Mitchell and Plaintiff's accounts as a team.

3

Mitchell testified that management was not initially involved in the discussions about a potential partnership with the Brendzas, but acknowledged that he did speak about the partnership with management after Plaintiff was fired. Brendza likewise testified that he never discussed the possibility of a partnership with management before Plaintiff's termination. Their recollections are consistent with those of Branch Manager Troy Mooyoung and Complex Manager Mark Evans, who both testified that they were not aware of any potential partnership until after Plaintiff left MSSB.

On September 19, 2012, the Brendzas joined Plaintiff and Mitchell in a meeting with a significant client. According to Mitchell, he and Plaintiff jointly agreed to work with the Brendzas on the account. Plaintiff testified that during the meeting, David Brendza commented on her recent marriage and alluded to her plans to start a family, suggesting that she might not be available to the client going forward or fully-committed to his account. Plaintiff submitted evidence through third party affidavits that David Brendza made similar comments to other clients of hers, though he flatly denies having done so. According to Plaintiff, she told Mitchell after the meeting that she would never partner with the Brendzas. Mitchell has no recollection of any such comment, but, as with every other contested statement made by Plaintiff, for the purposes of this ruling, the Court considers her version of the events to be true.

A few months before that meeting, on July 16, 2012, Plaintiff processed a $36,900 wire transfer request to a person and an account and a bank she was not

4

familiar with. The request for transfer was made by an imposter pretending to be the husband of one of Plaintiff's clients. The client's real husband was not an authorized signatory on the account; only the client was. MSSB requires financial advisors to confirm all transfer requests with the client by telephone—not by email or fax or any other method—prior to processing the request. Plaintiff admitted that she believed the imposter she spoke with was the husband of her client, and not the client herself. She also admitted that her client's husband was not authorized in accordance with firm policy to issue directives on the account. Still, she processed the transfer, thinking that an email purportedly in the name of the client and her husband allowed her to do so.

Plaintiff and MSSB became aware that the transfer request was fraudulent on Friday, August 10, 2012. Evans immediately began to investigate the circumstances of the transfer. Over the course of the next several weeks, he met with Plaintiff, who he says admitted she knew in retrospect it was improper to take the transfer instruction from her client's husband rather than her client. He also spoke with Mooyoung, MSSB fraud prevention and compliance officers, and in-house counsel. Evans also reviewed documents, e-mails and notes related to the fraudulent transfer and made internal inquiries about Plaintiff's disciplinary history, which included a one week suspension in 2008 for signing an elderly client's name to a letter of authorization (which she self-reported), and a letter of education in 2009 for adding information to a blank form previously signed by the client. These policy violations took place prior to Evans becoming complex manager. Evans

5

conferred with the supervisor who issued Plaintiff the 2009 letter of education and determined from that conversation that the discipline was warranted. He did not review Plaintiff's personnel file, audit or consider the performance of her book of business, or request input from peers or supervisors regarding her job performance.

Critically, Evans did not speak with Mitchell or either of the Brendzas in conducting his investigation. Mitchell and David Brendza both corroborated Evans' testimony that neither was involved, consulted or informed in any way about the scope or progress of the investigation. Mitchell testified that he learned that Plaintiff was terminated when he saw her being escorted from the building.

Evans testified that he based his decision to terminate Plaintiff on his own experience with handling disciplinary matters in the past. He said he was particularly troubled that Plaintiff took an order from a person whose name was not on the account. He noted that fraud attempts happen in every bank every day, but that they very rarely succeed as long as employees follow the stringent antifraud measures in place. He testified that he understood his decision had potentially career-impacting consequences, and that he took his time in reaching it to be sure it was the right call. He involved human resources, the legal department, fraud prevention, and compliance in reaching his conclusion.

The chronology of events is as follows: The fraud was discovered on Friday, August 10, 2012. Evans began his investigation the following Monday, August 13th. About a month later, on September 14, 2012, Plaintiff requested an update on Evans's investigation and disciplinary determination. She was informed the

6

investigation was ongoing. On September 19, 2012, she participated in the client meeting with the Brendzas, informing Mitchell afterwards that she would never partner with them. On September 24, 2012, Plaintiff was terminated.

Following her termination, the circumstances surrounding the fraudulent transfer were reported to regulators and Plaintiff voluntarily agreed to the imposition of a fine and censure, both of which appear on her publicly reported professional record. Not long after Plaintiff's termination, Mitchell entered into a partnership agreement with the Brendzas.

Plaintiff contends that MSSB financial advisor Vipul Shah, who also processed a fraudulent transfer based on a directive from an imposter but was not terminated by MSSB, was given more favorable treatment by Evans because he is a man. She also argues that Evans's termination decision was influenced by the Brendzas and Mitchell, who wanted her fired because she was an impediment to their partnership, because a pregnancy would inconvenience them and their clients, and because they are sexist.[2]

---

[2] In light of the Court's grant of summary judgment in Defendants' favor, Defendants' motion to strike, R. 59, is denied as moot. The Court notes, however, that many of Plaintiff's responses to Defendant's statement of material facts go well beyond admission or denial and are argumentative. They were subject to being stricken, but Plaintiff loses even considering all of the improper responses and Plaintiff's own statement of facts, which was also the subject of an at least potentially meritorious motion to strike.

# Analysis

## I. Title VII

The Seventh Circuit recently re-articulated the legal standard for Title VII discrimination cases:

> That legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence.

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (warning that any district court that treats the "convincing mosaic" metaphor as a legal requirement will be subject to summary reversal).

### A. <u>No Evidence of Discrimination</u>

The policy violation associated with processing the fraudulent transfer request was serious enough that Plaintiff voluntarily agreed to the imposition of a public fine and censure by regulators. Clearly Plaintiff was not meeting MSSB's legitimate performance expectations. MSSB's imposition of discipline under the circumstances certainly is legitimate.

Plaintiff thinks MSSB should have imposed a lesser discipline and given her another chance, especially as an 11-year employee. The Court does not doubt that Plaintiff believes she was treated unfairly. Indeed, the penalty seems harsh for a longstanding employee; the transfer looked like an innocent mistake. But it is not

8

the place of the Court to second guess employer disciplinary decisions. In fact, in such a heavily regulated field, this Court is particularly ill-suited to act as a "superpersonnel department," second-guessing decisions of people who are trained and work in that environment. *See Blise v. Antaramien*, 409 F.3d 861, 867 (7th Cir. 2005). Instead, the Court's task is to make sure those decisions were not made for impermissible reasons, such as on account of Plaintiff's gender.

Plaintiff argues that there is at least a question of fact regarding whether she was disciplined more harshly than Shah, a male financial advisor who also processed a fraudulent transfer request. But her comparator argument is unavailing. It's true that like Plaintiff, Shah processed a fraudulent transfer. However, unlike Plaintiff, Shah had no significant prior disciplinary record. He had minor complaints in his file from dissatisfied and frustrated customers, but none of the complaints were sustained by management as policy violations. Although Shah's case is superficially similar to Plaintiff's in that the fraudster Shah spoke with on the telephone pretended to be someone he wasn't, Shah still thought he was speaking with a signatory on the account. By contrast, Plaintiff took an order from a non-signatory. Even if Plaintiff's transfer had not been the result of fraud, but instead simply having been made pursuant to instructions from a person not authorized to give them, it still would have contravened firm policy. Plaintiff was duped by an imposter, but she shouldn't have taken instructions from him in the first place, even if he truly was who he pretended to be. Plaintiff argues that Shah should have been alerted to the fraudulent transfer request because of what she

9

characterizes as "a laughably bad" email. That's not how Evan's saw it. There is no evidence that Evans was soft on Shah and tough on Plaintiff because of their respective genders. The discrepancy in discipline imposed was reasonable and does not raise a triable issue of fact as to discrimination.

Another male employee identified as a comparator was Patrick Lauderdale. Lauderdale also processed a fraudulent transfer request. His did so based on an email request purporting to come from the client without ever attempting to reach the client to confirm authorization by phone. At the time Lauderdale processed the transfer, he had been formally disciplined at least three times. After processing the fraudulent transfer in violation of firm policy, he, like Plaintiff, was terminated. Quite simply, there is no evidence that similarly situated males employees were treated more favorably than Plaintiff.[3]

Even if a termination decision is ill-advised or misinformed, it is permissible as long as it is not based on the plaintiff's gender. Plaintiff makes a number of arguments in an attempt to show that she did not violate firm policy, that the policy itself was unclear, or that her conduct was less culpable than that of Lauderdale. She devoted a substantial amount of time to arguments relating to the email chain that preceded the transfer. Unfortunately for her, all it proves is that she was deceived by a clever fraudster. It doesn't change the fact that she shouldn't have been taking direction from anyone other than the client without a written

---

[3] Plaintiff posits a number of other MSSB employees who violated various firm policies yet were not discharged. None of them (other than Lauderdale) acted on the instruction of someone who, even if not an imposter, had no authority to issue directives on the account.

10

authorization on file, which did not exist. Plaintiff argues that she didn't violate any policy because she believed the email request for the transfer of funds was sent from the client's husband *and* the client jointly. But just like Lauderdale, Plaintiff didn't follow up and actually speak to the client to confirm the request. If she had, the transfer would not have occurred. Speaking with to the fake or real husband wasn't enough under the practices and policies of MSSB. In the end, Evans's determination of the gravity of the violation and the appropriate level discipline is controlling, as long as that determination was not motivated by discriminatory intent. The Court finds that on all of the evidence in the record construed in the light most favorable to Plaintiff, it was not.

B.  <u>Cat's Paw theory fails for lack of evidence of causation</u>

An employer can be held liable for discrimination where "one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 466 (7th Cir. 2016). Plaintiff argues that even if Evans was not motivated by discriminatory animus in making the disciplinary determination following her policy violation, he was influenced by Mitchell and the Brendzas who wanted her out of the way of their partnership. She posits that the fact that her termination came five days after she told Mitchell she would never partner with Brendzas is suspicious, and argues that a reasonable trier of fact could find on the basis of the suspicious timing that Mitchell and the Brendzas took steps during those five days to influence Evans's disciplinary determination.

11

There is no basis in the record for this argument. Plaintiff never specifies what action Mitchell or the Brendzas took to influence Evans's termination decision. There is no evidence that Mitchell or the Brendzas spoke with Evans at any point in the five days leading up to her termination. There is no evidence that Mitchell or the Brendzas filed complaints against Plaintiff or placed documents in her personnel file that could have influenced Evans's decision. Even if they had, there is no evidence that Evans undertook a comprehensive review of Plaintiff's employment file or that his decision had anything to do with Mitchell and Plaintiff's partnership, Plaintiff's job performance, or anything other than the circumstances of the fraudulent transfer and Plaintiff's disciplinary history. While it is troubling that Plaintiff was terminated after refusing to work with a man she considered a harasser, there is simply no evidence that Evans relied on anything Mitchell or the Brendzas did or said in reaching his decision.

Plaintiff points out that something must have happened between the time the fraud was discovered and her firing. She relies heavily on the fact that Evans said he learned everything he needed to know to make a decision in the first few days of his investigation. But his deposition makes clear that this was a decision he came to after consulting a number of people (but not Mitchell or the Brendzas), and that he took time to be careful in that decision because he recognized the gravity of its impact. Plaintiff said that Evans told her the disciplinary decision was up to MSSB's lawyer and human resources group, not him. Even if that were so, there is no indication in the record that the decision was influenced by anything other than

the fraudulent transaction and Plaintiff's prior disciplinary record. Plaintiff argues that there is an inference that Mitchell got into Evan's ear or some other decision-maker's ear and said to fire her. There is no evidence to support that inference, so the inference is not a reasonable one.

There is no evidence nor a reasonable inference that Evan's decision was influenced by the discriminatory motives of others, so the cat's-paw theory fails. *See Hill v. Potter*, 625 F.3d 998, 1102 (7th Cir. 2010) (holding that a cat's paw theory of discrimination liability requires evidence from which a finder of fact could reasonably infer that an individual's ill motives likely had an influence on the purportedly independent decisionmaker's thought process); *see also Johnson v. Koppers, Inc.,* 726 F.3d 910, 914 (7th Cir. 2013) (explaining that the cat's paw theory requires evidence that a biased subordinate's scheme was the proximate cause of the adverse employment action). Judgment is entered for Defendants on Plaintiff's discrimination claims.

## II. Hostile Work Environment

Title VII's prohibition against discrimination encompasses the "creation of a hostile work environment" that is severe or pervasive enough to affect the terms and conditions of employment. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556 (7th Cir. 2016). A hostile-work-environment claim requires proof of four elements: (1) the plaintiff's workplace was both subjectively and objectively offensive; (2) the plaintiff's gender was the cause of the harassment; (3) the harassment the plaintiff endured was severe or pervasive; and (4) there is a basis for employer liability. *Id.*

13

Because Plaintiff filed a complaint with the Illinois Department of Human Rights on March 6, 2013, her lawsuit is subject to a 300 day statute of limitations. *See* 42 U.S.C. § 2000e-5(e)(1). Most of the harassing conduct she details took place well outside that time period. Plaintiff argues that those incidents are nevertheless actionable because they form a single chain of conduct. *See Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004) (explaining that multiple acts can form a single hostile work environment claim if they are connected in time and circumstances such that they form a single chain of conduct).

A. <u>Statute of Limitations</u>

The discrete incidents of harassment Plaintiff details from 2003 to 2009 were neither a single chain of conduct themselves, nor linked in any way to the harassment that took place within the limitations period. The harassers during that earlier timeframe were a number of different people, their conduct was individualized and uncoordinated, and the incidents of harassment were disconnected in time and type (i.e., unwanted sexual advances versus unduly critical performance feedback). Notably, none of the harassers during that time period were Mitchell, and the type of harassment Plaintiff experienced during that timeframe differs significantly from the type she endured as Mitchell's partner in 2011 and 2012. All of the incidents outside of the limitations period are therefore time-barred.

B. Not objectively offensive, severe or
pervasive, and no basis for employer liability

The hostile work environment claims arising from Mitchell's comments and conduct also fail. The comments she ascribes to Mitchell from 2011 to 2012 regarding the clothing of a female news anchor and women on the escalator were neither severe in content or frequency as to be considered pervasive. Likewise, Mitchell's comments about Plaintiff's family planning calendar, while selfish, were not objectively offensive. The Court concedes that Mitchell may have acted insensitively and in poor taste, but a hostile work environment claim requires a great deal more than tastelessness to survive a motion for summary judgment. *See Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (noting that the threshold for plaintiffs asserting a hostile work environment is high, as "[t]he workplace that is actionable is one that is 'hellish'"). For these reasons, there is no basis for employer liability in his case. Judgement on the hostile work environment claims is also entered for Defendants.

**Conclusion**

For the foregoing reasons, Defendants' motion, R. 47, is granted, and Plaintiff's case is dismissed. Defendants' motion to strike, R. 59, is denied as moot.

ENTERED:

*Thomas M Durkin*
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: November 29, 2016